# <u>COMPLAINT</u>

# Docket No.  2:21-cv-1206

## U.S. DISTRICT COURT

## WESTERN DISTRICT OF PENNSYLVANIA

JOHN DOE

Plaintiff,

v.

UNIVERSITY OF PITTSBURGH (PITT), PITT SCHOOL OF MEDICINE,

JOHN HORN, KARA BERNSTEIN, VICE DEAN ANN THOMPSON, JOHN

DOES, and JANE DOES

Defendants.

## CAUSES OF ACTIONS

1. Title VI of the Civil Rights Act of 1964
2. Pennsylvania Human Relations Act (PHRA)
3. Equal Protection Claim
4. Section 1981 Liability
5. Section 1985 Liability
6. Section 1986 Liability
7. First Amendment Right
8. Fourteenth Amendment Right
9. Administrative Negligence
10. Negligent Retention
11. Negligent Supervision
12. Vicarious Liability
21. Intentional Interference with Contractual Relationship
13. Respondeat Superior Liability
14. Civil Conspiracy to Commit Tort
15. Aiding and Abetting the Commission of Tort
16. Concerted Action Claim
17. Negligent Indivisible Harm Caused by Separate Tortfeasors
18. Injurious Falsehood
19. Multiple-Actor Stigma-plus claims (Reputational Harm/Defamation)
20. Emotional Distress (Negligently and Intentionally Inflicted)

## FACTUAL ALLEGATIONS

1. From around October 2019 through to April 2021, Plaintiff has been subjected to coordinated, disparaging, and widespread ill-treatments from employees of the University of Pittsburgh. A hostile work and learning environment developed quickly as Plaintiff observed outsiders infiltrating the University around October 2019. These outsiders, both private individuals and government agents, are associated with ongoing lawsuits involving discrimination, retaliation, among other claims which Plaintiff commenced against other parties such as Montefiore Medical Center et al. in the Supreme Court of the State of New York, Bronx County, (Index # 42000/2020E which originally commenced in December 2016) and the City University of New York et al. in the Court of Claim of the State of New York, (Index # 127764 which originally commenced in December 2015).

2. There were a number of instances where Plaintiff was harassed during class by lecturers and outside of class by employees and students stemming from the larger retaliatory initiatives against him. Plaintiff was quickly and actively alienated and demonized by both students and employees, John Does and Jane Does, throughout the University including individual defendants identified and unidentified in the caption of this complaint.

3. Plaintiff was harassed by staff, John Does and Jane Does, from the military recruitment office at the University with not only repeated requests to join the military but repeated stalking. Some of the requests are made via emails and text messages. The initial ongoing court case filed by the Plaintiff included factual allegations against individuals making

aggressive and harmful attempts to coerce the Plaintiff to join the military in retaliation. The subsequent lawsuits are essentially tied to the continued retaliation from various individuals with power and influence.

4. Plaintiff was provided excuses after excuses from lecturers regarding the grade assigned to certain exam questions. While grading certain exam questions can be subjective, there is a degree of fairness and objectivity that is often present if reviewed by a third-party. In Fall 2019, Dr. John Horn who is the director of Plaintiff's Ph.D. program (IBGP) repeatedly promised to review the exams by comparing the responses different students provided for high, median, and low scores for certain highlighted exam questions.

5. Plaintiff notified the Chancellor of the University and subsequently the Executive Director of the Graduate Office about the retaliation he was facing tied to ongoing lawsuits. Plaintiff decided to notified the Chancellor partly due to past experiences where outsiders compromised or influenced employees of other institutions to aid-and-abet the outsiders' retaliatory actions and even bribed the employees. During a meeting in around November 2019, Dr. Horn informed Plaintiff with an upset tone of voice that the Chancellor conveyed that Plaintiff had emailed the Chancellor about the retaliations he has been experiencing.

6. Instead of conducting a review, Dr. John Horn placed Plaintiff on academic probation in December 2019 and barred Plaintiff from engaging in activities such as assisting with interview weekends for new Ph.D. applicants while other students could freely participate in interview weekends. Plaintiff was also alienated from social initiatives or programs affiliated with the University such as the BGSA Buddy program.

7.  When Plaintiff refused to accept the academic probation; insisted that he was
    purposefully graded harder; and noted that Dr. Horn failed to follow through with his
    review of the exams; Dr. Horn coerced Plaintiff to meet with a psychiatrist, John Doe,
    associated with the University around January 2020 in order to not be dismissed from the
    Ph.D. program. At the onset of the meeting, the psychiatrist attempted to label Plaintiff as
    psychotic with literally no basis. The psychiatrist appeared to become more empathetic as
    he listens to some of Plaintiff's experiences. But it was apparent that the psychiatrist had
    an agenda ahead of the meeting based on his quick labeling and curated questions.

8.  Plaintiff did his first lab rotation in Dr. Kara Bernstein's lab in Fall 2019. Dr. Bernstein
    was Plaintiff first advisor, a possible member of the Steering Committee which
    terminated Plaintiff, and the director for the specific research department, Molecular
    Genetic and Developmental Biology (MGDB), that Plaintiff joined. The lab rotation was
    going well until around November 2019 when outsiders (related to Plaintiff's ongoing
    lawsuits) begun to sabotage his work environment. Dr. Bernstein welcomed the
    retaliatory actions against Plaintiff. Plaintiff was frequently stalked and sometimes
    harassed by employees in that building and he begun to be alienated similar to
    experiences in other parts of the University. Plaintiff was saddened by this situation
    because it mimicked experiences he been through before where his employer was bribed
    millions of dollars to ferment a toxic work environment and ultimately terminated
    Plaintiff's job. That employer (i.e., Montefiore Medical Center et al.) is currently being
    sued in one of the ongoing lawsuits. Plaintiff also experienced stalking, harassment, and
    hostile work environment when he did his second lab rotation from both University
    employees and outsiders retaliating against him.

9.  On April 29, 2020, Plaintiff's inquiry about the final exam date was mischaracterized and horrified as an "troubling email" to the entire class by Dr. Bennett Van Houten. Initially, Dr. Bennett Van Houten attempted to say it was him who was troubled but subsequently apologized without sending a follow-up email as Plaintiff requested. There was no ambiguity in the actions he took which is a reflection of his unprovoked animosity towards Plaintiff.

10. In August 2020, Plaintiff formally joined his 3rd rotation lab on August 14, 2020 with both the director of MGDB, Dr. Kara Bernstein (Plaintiff's department) and his advisor/mentor Dr. Bokai Zhu signing off on Plaintiff's fully-funded appointment. This fully-funded appointment was renewable annually and was meant to cover the remaining years of Plaintiff's Ph.D. training.

11. On August 26, 2020, Plaintiff commenced a lawsuit in state court against the University after Dr. Horn terminated Plaintiff from the Ph.D. program on August 19, 2020 for not registering to retake the required course.

12. Early September 2020, Dr. Zhu abandoned the fully-funded appointment that he signed after Plaintiff initiated the lawsuit in state court for his initial termination (August 19, 2020). Plaintiff sent a few emails to Dr. Zhu and he has not responded.

13. Early September 2020, Dean Anantha Shekhar reviewed the exams and without any specific statement about the findings gave Plaintiff two options: retake the course or take a one-year leave of absence. Given a number of factors, Plaintiff opted to retake the course. In light of Dr. Zhu's abandonment of the fully-funded appointment, Dean Anantha Shekhar gave Plaintiff a conditional one-year scholarship which required successfully retaking the required course and finding a new lab.

14. Around early October 2020, Plaintiff reached out to Dr. Xing to rotate in his lab days before meeting with his three advisors appointed by Dr. Kara Bernstein under the conditional one-year scholarship. Plaintiff had reached out to Dr. Xing in Spring 2020 to rotate in his lab but he noted that his funding was limited. Dr. Xing agreed to allow Plaintiff to rotate in his lab starting around October 16, 2020. Though Plaintiff wanted to join Dr. Xing's lab, Dr. Xing suddenly changed his demeanor and interest without cause on Plaintiff's end. Also, Dr. Xing made taking machine learning course a definite requirement near the end of the semester.

15. On October 11, 2020, Plaintiff informed his advisors via email that he got a lab rotation opportunity in Dr. Xing's lab. Plaintiff had a zoom meeting with Dr. Tsang and Dr. Shin at 1pm October 12, 2020. (Dr. Tsang noted that Dr. Ghazi is on leave for the Fall semester). During the meeting Dr. Tsang noted repeatedly that Plaintiff should find another lab for rotation in Spring 2021 that is a wet lab. He noted this after Plaintiff informed him that he was planning on applying for F31 grant so that he could join Dr. Xing's lab which had limited funding. Dr. Tsang also noted that Plaintiff should not be concern about picking a particular lab because he will get that opportunity later on in his career. It was the latter part of the semester and really on December 4, 2020 when Dr. Ghazi noted via email that Plaintiff needed to definitely join a lab that Fall 2020 semester.

16. Hence, Plaintiff was misled about the timeline when he needed to definitely join a lab again. Furthermore, the new scholarship from the School of Medicine noted that Plaintiff should "make appropriate progress in laboratory research" so it did not explicitly state that he needed to join a lab in Fall 2020. Additionally, the scholarship was for one year

(September 1, 2020 to August 31, 2021). Most importantly, Plaintiff did join, not just one lab per requirement, but two labs within the normal timeline required: joined his 3rd rotation lab along with another lab for dry lab training. Both labs abandoned the agreement after Plaintiff filed complaint in state court upon his initial termination (August 19, 2020).

17. On November 24, 2020, Plaintiff emailed the Dean Anantha Shekhar about the continued and ongoing retaliatory actions he faces as well as widespread cheating reported in the required course that he was retaking. The widespread cheating was taking place in the course that Plaintiff was ultimately coerced to retake. Disparate grading was yet again experienced by Plaintiff in the same particular course which was essential for continuation in that Ph.D. program. Dean Anantha Shekhar acknowledged Plaintiff's email on November 30, 2020 and promised to reply to the content of the email subsequently.

18. On December 8, 2020, Plaintiff received an email from Vice Dean Ann Thompson reply[ing] to the email requesting an investigation into allegations of bias and retaliation that I sent to the Dean Anantha Shekhar. Dr. Ann Thompson noted that the "Dean's Office does not conduct investigations of this sort.... If you have academic concerns unrelated to allegations of retaliation and bias, please let me know and I can direct you to the appropriate handbook or policy to refer to." Dr. Ann Thompson also provided two links where Plaintiff could file a report. Plaintiff filed reports on December 8th and 9th, 2020.

19. On December 10, 2020, Plaintiff received the termination letter via email from Dr. Horn (the director of IBGP, chair of IBGP Steering Committee, and chair of Curriculum). The

letter was dated December 8, 2020 which is the same date Dr. Ann Thompson respond to the email sent to the Dean as well as the same date Plaintiff filed a report of retaliation and bias. The termination letter noted that "none of the mentors from three [lab] rotations during the first year concluded that you were qualified to conduct dissertation research in their programs."

20. The termination letter also noted:

> "For the fall 2020 term, a committee of three qualified members of the graduate training faculty (Drs. Arjumand Ghazi, Michael Tsang and Donghun Shin) was appointed [by Dr. Kara Bernstein] to advise you in the choice of a fourth rotation. After communicating with them, you decided that your most important priority was to do computational research related to aging. Based on this, you chose to work on a provisional basis in the research group of Dr. Jianhua Xing. Although professor Xing appreciated your enthusiasm for research in aging, he concluded that you did not have the requisite background in mathematics, physics and computer programming that would enable you to master machine learning and other techniques at a level sufficient for research in the Xing research group."

21. The statements supporting or justifying the termination are clearly inconsistent with reality and the facts noted herein.

22. On December 11, 2020, Mrs. Laurel Gift, Assistant Vice Chancellor in the Office of Compliance, Investigations & Ethics emailed me noting that she had received all Plaintiff's reports on discrimination, retaliation, and bias. After Plaintiff informed Mrs. Gift about the statements made by Dr. Ann Thompson, Mrs. Gift noted that she

"respectfully disagree with Vice Dean Ann Thompson's interpretation of the faculty obligations under the academic integrity policy, which clearly includes reference to discrimination. Retaliation would also fit under the obligation to base academic evaluation based on good-faith professional judgement and not to base academic evaluation on other factors such as retaliation. It is imperative that you go through the academic integrity process so I would follow the procedures I sent to you this morning."

23. From January 2021 to April 15, 2021, Plaintiff attended the three courses that he had registered for prior to receiving the termination letter on December 10, 2020. These courses were all held virtually on Zoom. Plaintiff attended the courses while he awaited injunctive relief from the unlawful termination in Courts. Two of the three courses did not involve any exams or tests.

24. On February 24, 2021, Plaintiff received an email that his student sponsored email account will expire on March 3, 2021. Plaintiff quickly brought the ending of his student account to the attention of the Court. On March 3, 2021, Mrs. Cynthia Stonebraker in the Department of Medicine follow through with her promise the day before to provide a temporary extension of Plaintiff's student account. Subsequently, Mrs. Stonebraker apprised Plaintiff via email that she was instructed by Plaintiff's department to change the extension from April 3, 2021 to March 10, 2021. Andrew Mumma in i-Target apprised Dr. John Horn about the one-month extension to April 3, 2021. Dr. John Horn apparently made an agreement with the Office of University Counsel to shorten the extension to March 10, 2021 due to the "sensitive nature of this case". This occurred

within a few hours because Plaintiff received confirmation of the change of extension that same morning of March 3, 2021.

25. On March 9, 2021, Mrs. Cynthia Stonebraker noted that Plaintiff's "account is property of university and I am following the rules" in response to Plaintiff's statement that he is "being unlawfully targeted by Dr. Horn." Moments later, Mrs. Sharon Miller, who Mrs. Stonebraker had copied in her email response, noted that "we are upholding the policy of the University of Pittsburgh and your account will not be extended beyond March 10, 2021. If you have issues with this, you can pursue it through the University's General Counsel." Plaintiff had pointed out the discrepancy between the stated general willfulness to provide requested extension to others but not to the Plaintiff. Plaintiff wanted to know the motive behind the different treatments. It had become apparent that the University is selective on which policy and even laws to uphold.

26. Plaintiff expressed to Ms. Amanda, coordinator for the exam-oriented course, that he is taking steps to address the issue which prevents him from registering for the courses again. From the onset of the course, there was another person auditing the course and at least on one occasion Ms. Amanda noted that it was fine for Plaintiff to audit the course as well.

27. Ms. Amanda informed Plaintiff about a Ph.D. training grant for their program on April 8, 2021; however, Plaintiff replied on April 8, 2021 that he had basically one more course after those courses currently taking (excluding a 1 credit seminar courses required for 6 semesters total) and therefore he wants to resolve the situation preventing him from registering for classes in the Ph.D. program he is already associated with. Plaintiff also

expressed that Ms. Amanda's Ph.D. program is interesting given its close relation to his research interest.

28. One week later on April 15, 2021, Plaintiff received a cease-and-desist email from Vice Dean Ann Thompson noting that Plaintiff is "no longer permitted on any University property (this includes virtual spaces). You will also be required to cease any and all communication with University faculty and staff….". Vice Dean Ann Thompson also threatened Plaintiff with "the issuance of a Persona non Grata ("PNG") notice and/or the filing of criminal trespass or harassment charges" if he does not "adhere to this directive". Plaintiff send a reply email challenging the deceptive narrative the Vice Dean presented. Plaintiff also sought clarification why another person was allowed to freely audit the course and not him. Plaintiff also sought clarification regarding the legal basis and University Code of Conduct policy violation(s) for the threat of Persona non Grata and/or filing of criminal trespass or harassment charges. The Vice Dean did not respond to none of Plaintiff's inquiries.

29. After April 9, 2021, Plaintiff stopped receiving emails from Ms. Amanda about the course Plaintiff was taking and the upcoming final exams. The final exam was just two weeks away and Vice Dean maliciously denied Plaintiff the opportunity to finish the course. Even if the grades would not be official until the Court had granted the relief requested, persons have freely audited courses time and time again.

30. On May 5, 2021, the Third Circuit Court established that the U.S. District Court does in fact has jurisdiction to hear the case. That very same day (5/5/2021), Dr. Wendy Mars, the Asst. Dean for the Learning Environment of that newly created office, sent out an email about the training grant on behalf of Ms. Amanda to several students including the

Plaintiff. The day before, May 4, 2021, Plaintiff was unsubscribed from the email list of his Ph.D. program department (MGDB). On the 1st and 4th of June 2021, Plaintiff received email from Ms. Amanda about the training grant and the deadline for applications on June 7, 2021.

31. Even if Plaintiff had decided to apply for that training grant, the December 8, 2020 termination letter had a clause which would have hindered matriculation into that program. The termination letter noted the following statements:

> "This decision is based on the General Regulations for Graduate Study at the University of Pittsburgh, which stipulate that, "A student whose performance on a preliminary or comprehensive examination is judged inadequate may be subject to dismissal." Moreover, the regulations further stipulate that, "Dismissal is a final action" and that "Dismissed students are not eligible for reinstatement at the University of Pittsburgh". I have provided resources below related to the University and IBGP guidelines for your review."

Hence, the very first step to a resolution is the uprooting or declaration of the termination as unlawful.

32. On July 19, 2021, Plaintiff reached out to University's General Counsel and the attorney representing the University, Mrs. Passarelli, to resolve this case outside of court because Plaintiff recognizes how damaging certain details of this case will be to the University. Plaintiff did not get a response to his email.

## **RELIEF**

33. Plaintiff seeks declarative order stating the unlawful nature of Plaintiff's termination, reinstating the full-scholarship/stipend, and declaring the University's onus in ensuring a timely completion of Plaintiff's doctoral training in light of the unlawful hinderances. Other reliefs such as permanent restraining order that the Court deemed just and appropriate.

34. On August 12, 2021, Plaintiff had a phone interview with Mr. Anthony White (Pittsburgh field office) at the Pennsylvania Human Relations Commission (PHRC). Throughout the interview, the discussion centered around some of retaliatory actions done to Plaintiff by Defendants. Mr. White noted Plaintiff would receive a drafted complaint to review by end of business on August 13, 2021. After several days of giving Plaintiff the run around, inaccurate notes that email was sent, and additional unfulfilled promise, Plaintiff finally got in touch with Mr. White via his office phone. Mr. White informed Plaintiff that the drafted C\complaint is outside the required 180 days after his fellow employees reviewed it. While the December 8, 2020 termination is outside of the 180 days required to report to PHRC for a PHRA claim, the actions taken by Vice Dean Ann Thompson was not untimely. Additionally, the other targeted and retaliatory action of shortening the extension of Plaintiff account is also not untimely (Plaintiff did not mention this specific incident). Mr. White declined to even provide a letter stating that Plaintiff's report to the PHRC is untimely so Plaintiff could have a record. Given that the PHRC is not interesting in fulfilling its duty or unreasonably disagrees with the viability of Plaintiff's PHRA claim, Plaintiff has included a PHRA claim in this complaint without a right to sue notice from PHRC. Plaintiff seeks miscellaneous relief for such inclusion or ask the Court to use its inherent power to determine the timeliness of Plaintiff's report made to

PHRC and hence the viability of the PHRA claim. Separately, the EEOC is working on a complaint Plaintiff for a Title VII claim. Given that Plaintiff needs to urgently resume the Ph.D. program, Plaintiff can include a Title VII claim in a subsequent amended complaint upon the court granting leave to amend.

35. Where appropriate, discrimination (based on race, color, and national origin), retaliation, hostile work environment, and aiding-and-abetting are invoked under each cause of actions. The claims against the individual Defendants are in both their official and individual capacities.

36. Please note that the information herein is fluid and can be selectively applicable to any viable causes of actions herein in order to make that particular claim viable or stronger.

37. Plaintiff is of dark complexion (Black) and born in Jamaica. Plaintiff was not only the only Black male student in his cohort, but also the only Black male student in the entire Ph.D. program when he matriculated (takes on average five years to complete that Ph.D. program). No other student or employee was subjected to the mistreatments described herein.

38. Plaintiff is seeking damages including punitive damages, aggravated damages, and nominal damages as well as declaratory orders and permanent restraining orders.

Dated: September 2, 2021

N.Weir  (to be redacted)

By: John Doe, Pro Se
/S/
4503 Stanton Ave
Pittsburgh, PA 15201
nw0354271@gmail.com
(mailing address if hardcopies need to be sent)

# VERIFICATION

_Nicholas Weir_ , being duly sworn, deposes and says:

I am the Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and behalf and as to those matters I believe them to be true.

Date: _09/02/2021_

_N. Weir_
(Signature)

Sworn to before me this _2nd_ day
of _September_ , 2021

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
Thomas Weifenbaugh, Notary Public
Allegheny County
My commission expires March 15, 2024
Commission number 1296744
Member, Pennsylvania Association of Notaries